United States District Court
Eastern District of Michigan
Northern Division


United States of America,

                 Plaintiff,

v.

One Million, One Hundred Seventy Nine
Thousand, Eight Hundred and Twenty Four
Dollars and Ninety-Seven Cents
($1,179,824.97) in funds from account:
XXXXXX0860 in the name of Safe
Investments, LLP at Pacific Life Insurance
Company; One Million, Eight Hundred Forty
Seven Thousand, Six Hundred and Fifty Four
Dollars and Two Cents ($1,847,654.02) in
funds from account: XXXXXX0270 in the
name of Safe Investments, LLP at Pacific Life
Insurance Company; Nine Hundred Twenty
Six Thousand, Six Hundred and Sixty Five
Dollars and Twenty-Six Cents ($926,665.26)
in funds from account: XXXXXX0266 in the
name of Safe Investments, LLP at Pacific Life
Insurance Company; Two Million, Five
Hundred Sixteen Thousand, One Hundred and
Ninety Three Dollars and Twenty-One Cents
($2,516,193.21) in funds from account:
XXXXXX0403 in the name of Safe
Investments, LLP at Pacific Life Insurance
Company; One Hundred Sixty Thousand,
Eight Hundred and Fifty-Five Dollars and

Case No.
Hon.


**<u>Demand for Jury Trial</u>**

1

Seventy-Six Cents ($160,855.76) in funds from account: XXXXX4062 in the name of Safe Investments, LLP at Western & Southern Financial Group; One Million, Sixty Six Thousand, Eight Hundred and Seventy Six Dollars and Eighty-Nine Cents ($1,066,876.89) in funds from account: XXXXX3374 in the name of Safe Investments, LLP at Western & Southern Financial Group; One Million, Sixty Two Thousand, Four Hundred and Seventy Seven Dollars and Thirty-One Cents ($1,062,477.31) in funds from account: XXXXX5632 in the name of Safe Investments, LLP at Sorrento Pacific Life, LLC; Two Million, Six Hundred Eighty Six Thousand, Seven Hundred and Thirty Three Dollars and One Cent ($2,686,733.01) in funds from account: XXXX-0371 in the name of Safe Investments, LLP at Robert W. Baird & Company, Milwaukee, WI; Four Million, Three Hundred Seventy Nine Thousand, Six Hundred and Seventy Three Dollars and Twelve Cents ($4,379,673.12) in funds from account: XX-XXX7139 in the name of Safe Investments, LLP at Lincoln National Life Insurance Company; Nine Hundred Ninety Thousand, Two Hundred and Ninety Eight Dollars and Twenty-Eight Cents  ($990,298.28) in funds from account: XX-XX6249 in the name of Safe Investments, LLP at Lincoln National Life Insurance Company; One Million, Seven Hundred Ninety Four Thousand, Four Hundred and Eighty-Eight Dollars and Twenty-Five Cents ($1,794,488.25) in funds

from account: XX-XXX7770 in the name of
Safe Investments, LLP at Lincoln National
Life Insurance Company; Seven Million,
Eight Hundred Eighteen Thousand, One
Hundred and Sixteen Dollars ($7,818,116.00)
in funds from account: XXXXX9982 in the
name of Safe Investments, LLP at Nationwide
Insurance Company; One Million, Four
Hundred Eighty Two Thousand, Seven
Hundred and Twenty Four Dollars and
Eighty-Nine Cents ($1,482,724.89) in funds
from account: XXXXX5882 in the name of
Safe Investments, LLP at Nationwide
Insurance Company; One Million, Two
Hundred Eighty One Thousand, Six Hundred
and Sixty Eight Dollars and Twenty-Two
Cents ($1,281,668.22) in funds from account:
XXXXX2482 in the name of Safe
Investments, LLP at Nationwide Insurance
Company; One Hundred Forty Seven
Thousand, Thirty-Three Dollars and Thirteen
Cents ($147,033.13) in funds from account:
XXXX6219 in the name of Vasso Godiali at
American Funds Service Company; One
Hundred Fifty Two Thousand, Nine Hundred
and Fifty Two Dollars and Eighty-Seven
Cents ($152,952.87) in funds from account:
XXXX6317 in the name of Vasso Godiali at
American Funds Service Company; One
Hundred Fifty Seven Thousand, Five Hundred
and Seventy Five Dollars and Ninety-Two
Cents ($157,575.92) in funds from account:
XXXX8656 in the name of Vasso Godiali at
American Funds Service Company;  Four
Million, Nine Hundred Two Thousand, Seven

Hundred and Eighty-Nine Dollars and Ninety-Seven Cents ($4,902,789.97) in funds from account XXXXXX3135 in the name of Safe Investments, LLP at Jackson National Life Insurance Company; Four Hundred Eighty Four Thousand, Nine Hundred and Eighty-Four Dollars and Nine Cents ($484,984.09) in funds from XXXXX1974 in the name of Vasso and Anna Godiali at Thumb National Bank and Trust; Six Thousand, Three Hundred and Sixty-Two Dollars and Thirty-One Cents ($6,362.31) in funds from XXXXX1501 in the name of Bay City Vascular at Thumb National Bank and Trust; Three Million, Three Hundred Seventy Three Thousand, Four Hundred and Seventy-Two Dollars and Fifty-Nine Cents ($3,373,472.59) in funds from XXXXX0385 in the name of Vasso and Anna Godiali at Thumb National Bank and Trust; Thirty Two Thousand, Seven Hundred and Fourteen Dollars and Eighty-Five Cents ($32,714.85) in funds from XXXXXX4747 in the name of Vasso and Anna Godiali at Huntington National Bank, and Twenty Three Thousand, Two Hundred and Six Dollars and Twenty-Four Cents ($23,206.24) in funds from XXXXXXXX9180 in the name of Anna Godiali ITF Vasso Godiali at Huntington National Bank,

     Defendants *in rem*.

---

## Complaint for Forfeiture

---

Plaintiff, the United States, by and through Matthew Schneider, United States Attorney for the Eastern District of Michigan, and Philip A. Ross, Assistant United States Attorney, states upon information and belief in support of this Complaint for Forfeiture as follows:

1.     This is an *in rem* civil forfeiture action pursuant to Title 18, United States Code, Sections 981(a)(1)(A) and/or (a)(1)(C).

2.     This Court has original jurisdiction over this forfeiture action pursuant to Title 28, United States Code, Section 1345 as this action is being commenced by the United States of America as Plaintiff.

3.     This Court has jurisdiction over this forfeiture action, pursuant to Title 28, United States Code, Section 1355(b)(1)(A), as the acts giving rise to forfeiture occurred in the Eastern District of Michigan.

4.     Venue is proper before this Court pursuant to Title 28, United States Code, Section 1391(b)(2) as a substantial part of the events or omissions giving rise to the Plaintiffs claims occurred in the Eastern District of Michigan.

5.     Venue is also proper before this Court pursuant to Title 28, United States Code, Sections 1395 (a) and (b) as the action accrued and/or the Defendants *in rem* were found and seized in the Eastern District of Michigan.

## **Defendants *In Rem***

6.     The Defendants *in rem* consist of the following:

5

a)      One Million, One Hundred Seventy Nine Thousand, Eight Hundred
and Twenty Four Dollars and Ninety-Seven Cents ($1,179,824.97) in
funds from account: XXXXXX0860 in the name of Safe Investments,
LLP at Pacific Life Insurance Company;

b)      One Million, Eight Hundred Forty Seven Thousand, Six Hundred and
Fifty Four Dollars and Two Cents ($1,847,654.02) in funds from
account: XXXXXX0270 in the name of Safe Investments, LLP at
Pacific Life Insurance Company;

c)      Nine Hundred Twenty Six Thousand Six Hundred and Sixty Five
Dollars and Twenty-Six Cents ($926,665.26) in funds from account:
XXXXXX0266 in the name of Safe Investments, LLP at Pacific Life
Insurance Company;

d)      Two Million, Five Hundred Sixteen Thousand One Hundred and
Ninety Three Dollars and Twenty-One Cents ($2,516,193.21) in funds
from account: XXXXXX0403 in the name of Safe Investments, LLP
at Pacific Life Insurance Company;

e)      One Hundred Sixty Thousand Eight Hundred Fifty Five Dollars and
Seventy-Six Cents ($160,855.76) in funds from account:
XXXXX4062 in the name of Safe Investments, LLP at Western &
Southern Financial Group;

f)      One Million, Sixty Six Thousand, Eight Hundred and Seventy Six Dollars and Eighty-Nine Cents ($1,066,876.89) in funds from account: XXXXX3374 in the name of Safe Investments, LLP at Western & Southern Financial Group;

g)      One Million, Sixty Two Thousand, Four Hundred and Seventy Seven Dollars and Thirty-One Cents ($1,062,477.31) in funds from account: XXXXX5632 in the name of Safe Investments, LLP at Sorrento Pacific Life, LLC;

h)      Two Million, Six Hundred Eighty Six Thousand, Seven Hundred and Thirty Three Dollars and One Cent ($2,686,733.01) in funds from account: XXXX-0371 in the name of Safe Investments, LLP at Robert W. Baird & Company, Milwaukee, WI;

i)      Four Million, Three Hundred Seventy Nine Thousand, Six Hundred and Seventy Three Dollars and Twelve Cents ($4,379,673.12) in funds from account: XX-XXX7139 in the name of Safe Investments, LLP at Lincoln National Life Insurance Company;

j)      Nine Hundred Ninety Thousand, Two Hundred and Ninety Eight Dollars and Twenty-Eight Cents ($990,298.28) in funds from account: XX-XX6249 in the name of Safe Investments, LLP at Lincoln National Life Insurance Company;

k)    One Million, Seven Hundred Ninety Four Thousand, Four Hundred and Eighty-Eight Dollars and Twenty-Five Cents ($1,794,488.25) in funds from account: XX-XXX7770 in the name of Safe Investments, LLP at Lincoln National Life Insurance Company;

l)    Seven Million, Eight Hundred Eighteen Thousand, One Hundred and Sixteen Dollars ($7,818,116.00) in funds from account: XXXXX9982 in the name of Safe Investments, LLP at Nationwide Insurance Company;

m)    One Million, Four Hundred Eighty Two Thousand, Seven Hundred and Twenty Four Dollars and Eighty-Nine Cents ($1,482,724.89) in funds from account: XXXXX5882 in the name of Safe Investments, LLP at Nationwide Insurance Company;;

n)    One Million, Two Hundred Eighty One Thousand, Six Hundred and Sixty Eight Dollars and Twenty-Two Cents ($1,281,668.22) in funds from account: XXXXX2482 in the name of Safe Investments, LLP at Nationwide Insurance Company;

o)    One Hundred Forty Seven Thousand, Thirty-Three Dollars and Thirteen Cents ($147,033.13) in funds from account: XXXX6219 in the name of Vasso Godiali at American Funds Service Company;

p)   One Hundred Fifty Two Thousand, Nine Hundred Fifty Two Dollars
and Eighty-Seven Cents ($152,952.87) in funds from account:
XXXX6317 in the name of Vasso Godiali at American College Funds
Service Company;

q)   One Hundred Fifty Seven Thousand, Five Hundred and Seventy Five
Dollars and Ninety-Two Cents ($157,575.92) in funds from account:
XXXX8656 in the name of Vasso Godiali at American College Funds
Service Company;

r)   Four Million, Nine Hundred Two Thousand, Seven Hundred and
Eighty-Nine Dollars and Ninety-Seven Cents ($4,902,789.97) in funds
from account XXXXXX3135 in the name of Safe Investments, LLP at
Jackson National Life Insurance Company;

s)   Four Hundred Eighty Four Thousand, Nine Hundred and Eighty-Four
Dollars and Nine Cents ($484,984.09) in funds from XXXXX1974 in
the name of Vasso and Anna Godiali at Thumb National Bank and
Trust;

t)   Six Thousand, Three Hundred and Sixty-Two Dollars and Thirty-One
Cents ($6,362.31) in funds from XXXXX1501 in the name of Bay
City Vascular at Thumb National Bank and Trust;

u)    Three Million, Three Hundred Seventy Three Thousand, Four

Hundred and Seventy-Two Dollars and Fifty-Nine Cents

($3,373,472.59 in funds from XXXXX0385 in the name of Vasso and

Anna Godiali at Thumb National Bank and Trust;

v)    Thirty Two Thousand, Seven Hundred and Fourteen Dollars and

Eighty-Five Cents ($32,714.85) in funds from XXXXXX4747 in the

name of Vasso and Anna Godiali at Huntington National Bank; and

w)    Twenty Three Thousand, Two Hundred and Six Dollars and Twenty-

Four Cents ($23,206.24) in funds from XXXXXXXX9180 in the

name of Anna Godiali ITF Vasso Godiali at Huntington National

Bank.[1]

7.    The Defendants *in rem* described in Paragraph 6(a)-(w) shall be

referred to collectively as the "Defendant Currency."

8.    The Defendant Currency is, and will continue to be, in the custody of

the United States Marshals Service.

## **Statutory Basis For Civil Forfeiture**

9.    Title 18, United States Code, Section 1347(a) prohibits engaging in

schemes to defraud Medicare and other health benefit programs including

---

[1] The values reflected in subparagraphs a-w reflect the values of the accounts at the
time of seizure in April 2017.

Medicaid, and Blue Cross and Blue Shield.

10.     Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—

A.     (1)   to defraud any health care benefit program; or

B.     (2)   to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both. If the violation results in serious bodily injury (as defined in section 1365 of this title), such person shall be fined under this title or imprisoned not more than 20 years, or both; and if the violation results in death, such person shall be fined under this title, or imprisoned for any term of years or for life, or both.

11.     Title 18, United States Code, Section 24(b), defines a "health care benefit program" as, among other things, "any public or private plan…affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service, for which payment may be made under the plan."

11

12.     Title 18, United States Code, Section 1956 prohibits engaging in monetary transactions in property derived from specified unlawful activity:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –
>
> A.     With the intent to promote the carrying on of a specified unlawful activity;
>
> B.     Knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the rouse, the ownership or control of the proceeds of a specified unlawful activity.

13.     Title 18, United States Code, Section 1956 sets forth a list of "specified unlawful activities," which includes, "any act or activity constituting an offense involving a federal health care offense."  18 U.S.C. § 1956(c)(7)(F).

14.     Title 18, United States Code, Section 1957 prohibits knowingly engaging in or attempting to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity.

## **Relevant Forfeiture Statutes**

15.    Title 18, United States Code, Section 981(a)(1)(A) provides for the

civil forfeiture to the United States of any property, real or personal, involved in a

transaction or attempted transaction in violation of section 1956, 1957 or 1960 of

Title 18, or any property traceable to such property.

16.    Title 18, United States Code, Section 981(a)(1)(C) provides for the

civil forfeiture to the United States of the proceeds of crimes designated as

"specified unlawful activities" as defined in section 1956(c)(7), or a conspiracy to

commit such offense.

17.    Title 18, United States Code, Section 984 Civil Forfeiture of Fungible

Property:

> (a)(1) In any forfeiture action in rem in which the subject property is .
> . . funds deposited in an account in a financial institution . . .

> (A)  it shall not be necessary for the Government to identify the
> specific property involved in the offense that is the basis for
> forfeiture; and

> (B)  it shall not be a defense that the property involved in such an
> offense has been removed and replaced by identical property.

## Facts Supporting Forfeiture of Defendants *in rem*

### The Medicare Program

18.　The Medicare Program ("Medicare") is a federally-funded health care program for the aged and disabled established by Congress in 1965, as Title XVIII of the Social Security Act and codified at Title 42, United States Code, Section 1395.　Medicare is administered through the Centers for Medicare and Medicaid Services ("CMS").

19.　Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

20.　CMS is a division of the United States Department of Health and Human Services.　Individuals who receive Medicare benefits are referred to as Medicare "beneficiaries."

21.　Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D).　Medicare Part A covers physical therapy, occupational therapy, and skilled nursing services in a facility.　Part B covers the cost of physicians, services and other ancillary services not covered by Part A.　Part D, which must be combined with coverage from an insurance company or other private company approved by Medicare, covers prescription drugs.

14

22.     The basic requirement for any claim to be payable by Medicare is that the service must be "reasonable and necessary for the diagnosis or treatment of illness or injury" defined and based upon accepted practices in the medical community, and further defined by National Coverage Determinations issued by CMS and Local Coverage Determinations issued by the Medicare administrative contractor for the State of Michigan.

23.     At all times relevant to this Complaint, VASSO GODIALI was enrolled as a participating Medicare provider and submitting claims to Medicare.

24.     The application signed by VASSO GODIALI indicated that he agreed to abide by the Medicare laws, regulations, and program instructions, and that he understood that payment of Medicare claims is conditioned upon the claim and underlying transaction complying with such laws, regulations, and program instructions.  By signing the certification statement, VASSO GODIALI also agreed that he would not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and would not submit claims with deliberate ignorance of or reckless disregard of their truth or falsity.

***Defendants In Rem***

25.     Defendants *in rem* constitute gross proceeds of health care fraud, and or, constitute or are derived from property involved in money laundering.

*Related Criminal Case*

26.     On June 26, 2019, a Federal Grand Jury in the Eastern District of
Michigan indicted VASSO GODIALI charging him with two counts of Health
Care Fraud in violation of Title 18, United States Code, Section 1347, and five
counts of money laundering in violation of Title 18 United States Code, Sections
1956 and/or 1957 in Case No.19-20431 (E.D. Mich.).

27.     As set forth in the paragraphs above, the Defendants *in rem* constitute
property derived from, and/or traceable to proceeds and/or gross proceeds of health
care fraud in violation of Title 18, United States Code, Section 1347.

28.     As set forth in the paragraphs above, the property constitutes and or is
derived from property involved in money laundering in violation of Title 18,
United States Code, Sections 1956 and/or 1957.  The funds are therefore subject to
seizure and civil forfeiture to the United States, pursuant to Title 18, United States
Code, Section 981(a)(1).

## Factual Background

*Vasso Godiali and Bay City Vascular P.C.*

29.     VASSO GODIALI, a resident of Bay County, Michigan, was a
vascular surgeon licensed to practice medicine in the State of Michigan.

30.     Bay City Vascular, P.C., located at 2010 15th Street, Bay City,
Michigan, was GODIALI's medical practice.

31.     GODIALI was a physician-enrollee in Medicare and Medicaid, and Blue Cross Blue Shield of Michigan, as such, was subject to their rules and regulations.

## The Medicare Program

32.     The Medicare Program ("Medicare") is a federally funded health care program providing benefits to persons who are over the age of sixty-five or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the Department of Health and Human Services ("HHS"). Individuals who receive Medicare benefits are referred to as Medicare "beneficiaries."

33.     Medicare Part B helps pay the cost of physician services, medical equipment and supplies, and other health services and supplies not paid by Part A. Under Medicare Part B, services must be medically necessary and provided by licensed physicians or otherwise qualified medical professionals. Medicare claims for Part B services are processed and paid by Medicare Administrative Contractors, known as MACs, who contract with CMS to administer specific parts of the Medicare program in specific jurisdictions.

34.     By becoming a participating provider in Medicare, enrolled providers agree to abide by the policies and procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers, together with their

authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies and procedures, rules, and regulations, issued by CMS and its authorized agents and contractors.

35.    CMS relies on a network of MACs to process Medicare claims, and MACs serve as the primary operational contact between the Medicare Fee-For-Service program, and approximately 1.5 million health care providers enrolled in the program. MACs enroll health care providers in the Medicare program and educate providers on Medicare billing requirements, in addition to answering provider and beneficiary inquiries.

36.    Wisconsin Physicians Service ("WPS") administered the Medicare Part B program for claims arising in the State of Michigan. CMS contracted with WPS to receive, adjudicate, process, and pay certain Part B claims, including medical services related to physician office services, including outpatient surgery, including for the placement and removal of vascular stents.

37.    Medicare providers are required to maintain all records that document the services provided and significant business transactions for at least a period of six years.

38.    Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

## **The Medicaid Program**

39.     Pursuant to Title XIX of the Social Security Act (42 USC 1396, et

seq.) and the Michigan Social Welfare Act (400.1, et seq.; MSA 16.614(11), as

amended) the Michigan Department of Community Health (hereinafter referred to

as DCH) administered the Michigan Medical Assistance Program (hereinafter

referred to as Medicaid).

40.     Medicaid is a Federal/State program, which has as its purpose the

provision of medical services to those persons who could not otherwise afford

them.

41.     Providers who seek to bill Medicaid were informed of the rules and

responsibilities through provider manuals that are provided to them by DCH (for

Medicaid) at the time of enrollment, and periodically receive correspondence when

policy/procedural changes occur. Medicaid and Medicare participating providers

and/or facilities applied to Medicaid and Medicare programs for the ability to bill

Medicaid and Medicare. As part of the application process, the provider must

certify that they will comply with the Medicaid and Medicare regulations.

42.     Medicaid is a "health care benefit program" as defined by Title 18,

United States Code, Section 24(b).

## Blue Cross Blue Shield Of Michigan

43.     Blue Cross Blue Shield of Michigan (BCBSM) was a non-profit, private health insurance company based in Detroit, Michigan. BCBSM was the largest independent licensee of Blue Cross Blue Shield Association, which was a federation of thirty-nine separate health insurance organizations and companies in the United States.

44.     Physicians contract with BCBSM to provide health care services to BCBSM members. In return, BCBSM will pay the physician directly for services rendered to BCBSM members. BCBSM requires participating providers to submit a diagnostic and procedure code on claims to be paid for professional services rendered to BCBSM subscribers.  Payment for services depends on the truthful submission of specific diagnostic codes indicated on the claim.

45.     BCBSM is a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

## Relevant Services Covered by Medicare, Medicaid and BCBSM

46.     A dialysis fistula was a surgical connection between an artery and a vein that is commonly used to facilitate hemodialysis. Blockages requiring medical attention occur within a fistula and associated veins over time.

47.     A thrombectomy was a medical procedure to treat blood clots.

48.     A vascular stent was a tube that was inserted into a blood vessel to

improve blood flow when a vein or artery is too narrow. Vascular stents were

designed in a way to permit the device to be compressed onto a catheter. The

specific engineering of an individual stent will create a design that is balloon-

expandable or self-expanding when deployed into a vessel with the use of

radiological guidance. Once deployed, the stent was designed to remain

permanently in the vessel.

### **Billing & Payment**

49.     To receive payment from Medicare, Medicaid, or BCBSM for a

covered service, a medical provider was required to submit a claim, either

electronically or in writing. The claim was required to include information

identifying the patient and the services rendered. Medical providers were

authorized to submit claims to Medicare, Medicaid and BCBSM only for services

they actually rendered and were required to maintain patient records verifying the

provision of services. By submitting a claim, the provider certified, among other

things, that the services were provided to the patient and were medically necessary.

50.     Providers submitted claims to Medicare, Medicaid, and BCBSM using

billing codes, also called Current Procedural Terminology (CPT) codes. The codes

are a systematic listing, or universal language, used to describe the procedures and

services performed by health care providers. Health care benefit programs,

including Medicare, Medicaid and BCBSM, use these codes to understand and

evaluate the claims submitted by providers and to decide whether to issue or deny payment. Each health care benefit program establishes a fee or reimbursement level for each service described by a CPT code.

51.    One function of Medicare's National Correct Coding Initiative (NCCI) is to prevent multiple payments for codes that report overlapping, or "bundled," services. "Modifier 59" is a coding modifier that allows providers to override the general rule against multiple payments of bundled claims when multiple services are actually "separate and distinct."  Modifier 59 is intended to identify clearly independent procedures that represent significant departures from the usual surgical situations and warrant payment for both procedures.

52.    CPT code 36147 is a billing code that is reported when a physician uses an x-ray procedure known as a fistulagram to check for blood clots or other blockages in a dialysis fistula. This code includes the initial access to the fistula and all imaging of and beyond the fistula to the heart, thus, separate billing of those components is prohibited.

53.    From 2009 until 2015, GODIALI devised and intended to devise a scheme and artifice to defraud and to obtain money from Medicare, Medicaid and BCBSM by means of false and fraudulent pretenses, representations and promises.

54.     It was a part of the scheme to defraud that at various times:

a.  GODIALI submitted and caused the submission of false and
    fraudulent claims to Medicare, Medicaid and BCBSM.

b.  GODIALI performed certain procedures but then dictated
    operative reports and billed Medicare, Medicaid and BCBSM for
    multiple additional procedures that he did not perform.

c.  GODIALI falsely recorded that he had removed fractured stents to
    justify purported stent placements that were not medically
    necessary. In 2009, Medicare paid GODIALI $73,896 for having
    purportedly placed 41 vascular stents. By fraudulently claiming to
    have removed and replaced fractured stents, GODIALI increased
    the number of stents for which he was paid by Medicare to 245 in
    2014. In that year alone, Medicare paid GODIALI over $700,000
    for the placement of vascular stents.


*[SPACE INTENTIONALLY LEFT BLANK]*

d. The chart below illustrates the instances in which GODIALI was
paid by Medicare for the purported placement of stents:

| MEDICARE SUMMARY | | | | |
|---|---|---|---|---|
| Service Year | Paid | # of CPTs 37205/37238 | Paid - CPTs 37205/37238 | # of Patients |
| 2006 | $1,453,738.92 | 16 | $ 4,575.76 | 1,775 |
| 2007 | $2,693,611.47 | 7 | $ 2,148.77 | 1,803 |
| 2008 | $3,639,847.71 | 35 | $ 68,894.58 | 1422 |
| 2009 | $3,647,518.87 | 41 | $ 73,896.00 | 1253 |
| 2010 | $6,161,202.82 | 76 | $ 151,551.43 | 1797 |
| 2011 | $7,480,689.89 | 76 | $ 202,782.46 | 1683 |
| 2012 | $10,345,663.27 | 159 | $ 475,488.52 | 1621 |
| 2013 | $11,146,912.49 | 250 | $ 792,789.00 | 1608 |
| 2014 | $11,085,163.07 | 245 | $ 713,356.11 | 1482 |
| 2015 | $2,371,981.74 | 47 | $ 115,650.68 | 1022 |
| 2016 | $116,220.69 | 2 | $ 5,966.08 | 95 |
| TOTALS | $60,142,550.94 | | $2,607,099.39 | |

e. GODIALI falsely recorded that he observed and removed a clot or
clots in the brachial arteries of his patients. From 2006 through
2009, GODIALI did not bill for the removal of arterial clots using
mechanical thrombectomy. In 2010, Medicare paid GODIALI
$8956.68 for having purportedly performed this procedure 12
times. By fraudulently claiming to have removed arterial clots
using thrombectomy, GODIALI increased the number of arterial
mechanical thrombectomy procedures for which he was paid by
Medicare to 815 in 2014. In that year alone, Medicare paid

GODIALI over $1,100,000 for arterial mechanical thrombectomy procedures purportedly performed.

f.  The chart below illustrates the instances in which GODIALI was paid by Medicare for purportedly providing arterial mechanical thrombectomies:

| MEDICARE SUMMARY | | | | |
|---|---|---|---|---|
| Service Year | Paid | # of CPT 37184 | Paid - CPT 37184 | # of Patients |
| 2006 | $ 1,453,738.92 | | | 1,775 |
| 2007 | $ 2,693,611.47 | | | 1,803 |
| 2008 | $ 3,639,847.71 | | | 1422 |
| 2009 | $ 3,647,518.87 | | | 1253 |
| 2010 | $ 6,161,202.82 | 12 | $ 8,956.68 | 1797 |
| 2011 | $ 7,480,689.89 | 101 | $ 165,751.85 | 1683 |
| 2012 | $ 10,345,663.27 | 544 | $ 814,132.53 | 1621 |
| 2013 | $ 11,146,912.49 | 750 | $ 1,039,460.04 | 1608 |
| 2014 | $ 11,085,163.07 | 815 | $ 1,101,487.30 | 1482 |
| 2015 | $ 2,371,981.74 | 9 | $ 10,654.35 | 1022 |
| 2016 | $ 116,220.69 | | | 95 |
| TOTALS | $ 60,142,550.94 | | $ 3,140,442.75 | |

55.    From on or about 2009 through 2015, in the Eastern District of Michigan, Northern Division, VASSO GODIALI, in connection with the delivery of a payment for health care benefits, items, and services, knowingly and willfully executed, and attempted to execute, the scheme described in this Complaint, that is, a scheme and artifice to defraud Medicare, Medicaid, and BCBSM, each of which are health care benefit programs affecting commerce, and to obtain, by

means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services.

56.    From 2009 until 2015, GODIALI devised and intended to devise a scheme and artifice to defraud and to obtain money from Medicare, Medicaid and BCBSM by means of false and fraudulent pretenses, representations and promises.

57.    It was a part of the scheme to defraud that at various times:

    a.  GODIALI fraudulently used coding modifier 59 to override the general rule against multiple payments of bundled claims when multiple services are actually "separate and distinct."

    b.  By fraudulently using modifier 59 to unbundle payment for a single procedure into multiple procedures, GODIALI was overpaid by Medicare, Medicaid and BCBSM for multiple procedure codes when payment should have only been made for one procedure code.

    c.  GODIALI fraudulently billed Medicare, Medicaid and BCBSM for a fistulagram using CPT code 36147 together with the codes for components of that procedure that should not have been paid together. GODIALI directed his staff to add modifier 59 to those

claims and thus falsely certified that the procedures were separate

and distinct to override the prohibition of billing these codes

together, when, in fact, they were components of the fistulagram.

58.     That between May 2009 and May 2016, in the Eastern District of

Michigan, GODIALI deposited or caused the deposit of Medicare and BCBSM

reimbursements into Bay City Vascular First Merit Bank Account xxxxxx2964.

59.     At all times relevant to this indictment, First Merit Bank was insured

by the Federal Deposit Insurance Corporation (FDIC).

60.     Having deposited reimbursements from Medicare and BCBSM into

First Merit Bank Account xxxxxx2964, GODIALI conducted and attempted to

conduct financial transactions causing the transfer of funds from Bay City Vascular

First Merit Bank Account xxxxxx2964 into accounts held in the name of six

corporations, which were controlled by GODIALI as illustrated below:

| Corporations | First Merit Bank Accounts | Amount |
|---|---|---|
| Bay City Ultrasonography & Medical, PC | xxxxxx3791 | $5,756.520.52 |
| Bay City Vein Institute, PC | xxxxxx9777 | $9,915,910.26 |
| Mid-Michigan Vascular Access, PC | xxxxxx3871 | $9,546,140.57 |
| Hemodialysis Association of the Tri-City Area, PC | xxxxxx4754 | $9,284,324.07 |

| Corporations | First Merit Bank Accounts | Amount |
|---|---|---|
| Tri-City Area Wound Care Clinic, PC | xxxxxxx4762 | $4,432,471.79 |
| Mid-Michigan Endovascular Institute, PC | xxxxxxx6922 | $10,099,359.55 |

61.     Having transferred funds from Bay City Vascular  First Merit Bank Account xxxxxx2964 to the above-described accounts for Bay City Ultrasonography & Medical, PC, Bay City Vein Institute, PC, Mid-Michigan Vascular Access, PC, Hemodialysis Association of the Tri-City Area, PC, Tri-City Wound Care, PC, and Mid-Michigan Institute, PC, GODIALI subsequently conducted and attempted to conduct financial transactions causing the transfer of funds into Metro Medical First Merit Bank Account xxxxxx3565 in the following amounts:

| DEPOSITS TO METRO MEDICAL | | |
|---|---|---|
| Corporations | First Merit Bank Accounts | Amount |
| Bay City Ultrasonography & Medical, PC | xxxxxx3791 | $2,396,185.18 |
| Bay City Vein Institute, PC | xxxxxx9777 | $5,487,507.99 |
| Mid-Michigan Vascular Access, PC | xxxxxx3871 | $5,606,536.53 |
| Hemodialysis Association of the Tri-City Area, PC | xxxxxx4754 | $5,606,503.91 |
| Tri-City Wound Care Clinic, PC | xxxxxxx4762 | $2,389,667.80 |

| DEPOSITS TO METRO MEDICAL | DEPOSITS TO METRO MEDICAL | DEPOSITS TO METRO MEDICAL |
|---|---|---|
| Mid-Michigan Endovascular Institute, PC | xxxxxxx6922 | $5,546,844.91 |

62.     Having moved funds from Bay City Vascular to Metro Medical First Merit Account xxxxxxx3565 between May 2009 and on or about May 2015 in the Eastern District of Michigan and elsewhere, VASSO GODIALI transferred or caused to be transferred funds from Metro Medical First Merit Bank Account xxxxxx3565 ultimately into ten separate investment accounts.

63.     That on or about the dates listed in the chart below, in the Eastern District of Michigan and elsewhere, VASSO GODIALI, knowing that the property involved represented the proceeds of some form of unlawful activity, as defined in Title 18, United States Code, Section 1956(c)(1), did cause to be conducted, a financial transaction which involved the proceeds of the said unlawful activity knowing that the transaction was designed in whole or in part, to conceal and/or disguise the nature, location, source, ownership and control of the proceeds of that is, health care fraud, a felony under Title 18, United States Code, Section 1347; all in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i):

| Date | Amount | Financial Institution | Account Number |
|---|---|---|---|
| April 12, 2013 | $1,352,717.38 | Pacific Life | Xxxxxx0860 |
| Nov. 14, 2013 | $1,103,413.27 | Lincoln National Life | xx-xx6249 |
| Jan. 27, 2014 | $1,500,000 | Nationwide Life | xxxxx2482 |
| Apr. 10, 2014 | $2,135,002.79 | Lincoln National Life | xxxxx7770 |

64.     Having deposited reimbursements from Medicare and BCBSM into First Merit Bank Account xxxxxx2964, VASSO GODIALI, in the Eastern District of Michigan and elsewhere, conducted and attempted to conduct a financial transaction causing the transfer of funds in the amount of $5,150.80 on September 15, 2014, from Bay City Vascular First Merit Bank Account xxxxxx2964 to pay for property taxes for a residence located at 6xx Old Trail Road, Houghton Lake, Michigan knowing that the property involved represented the proceeds of some form of unlawful activity, as defined in Title 18, United States Code, Section 1956 (c)(1), did cause to be conducted, a financial transaction which involved the proceeds of the said unlawful activity knowing that the transaction was designed in whole or in part, to conceal and/or disguise the nature, location, source, ownership and control of the proceeds of health care fraud, a felony under Title 18, United States Code, Section 1347; all in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

## CLAIM FOR RELIEF

65.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs.

66.     The defendants *in rem* are forfeitable to the United States of America pursuant to Title 18, United States Code, Section 981(a)(1)(A) because they constitute or were derived from property involved in money laundering, and or

pursuant to Title 18, United States Code, Section 981(a)(1)(C) as gross proceeds of a scheme to defraud Medicare, Medicaid, and BCBSM and/or are property traceable to the proceeds of illegal activity, specifically health care fraud, in violation of Title 18, United States Code, Section 1347.

## Demand for Jury Trial

Plaintiff respectfully requests a trial by jury in this case.

*[SPACE INTENTIONALLY LEFT BLANK]*

## Conclusion and Relief

Plaintiff respectfully requests that a warrant for arrest of the Defendants *in rem* be issued; that due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed; that judgment be entered declaring the Defendants *in rem* to be condemned and forfeited to the United States for disposition according to law; and that the United States be granted such other further relief as this Court may deem just and proper together with costs and disbursements of this action.

Respectfully submitted,

Matthew Schneider
United States Attorney

Philip A. Ross
Assistant United States Attorney
211 W. Fort St., Ste. 2001
Detroit, MI 48226
(313) 226-9790
Philip.Ross@usdoj.gov
Virginia State Bar #70269

Date: July 11, 2019

## <u>VERIFICATION</u>

I, Bryan Butler, state that I am a Special Agent of the Federal Bureau of

Investigation ("FBI").  I have read the foregoing Complaint for Forfeiture, and

declare under penalty of perjury that the facts contained therein are true and correct

to the best of my knowledge and belief, based upon knowledge possessed by me

and/or on information received from other law enforcement agents and employees

of the United States Government.


Bryan M. Butler
Special Agent
Federal Bureau of Investigation

Dated: 7/10/19